IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LANA SAMPSON                          :
                                      :      CIVIL ACTION
           v.                         :
                                      :      NO. 11-4553
METHACTON SCHOOL DISTRICT,            :
ET AL.                                :

## MEMORANDUM

**SURRICK, J.**                                    **FEBRUARY 12th, 2015**

Presently before the Court is Defendants Methacton School District, Timothy Quinn,

Robert Harney, and Judith Landis's Motion for Summary Judgment.  (ECF No. 20.)  For the

following reasons, Defendants' Motion will be granted.

## I.     BACKGROUND

### A.     Procedural History

Plaintiff filed a complaint with the Equal Employment Opportunity Commission

("EEOC") for disability discrimination on June 7, 2010.  (Second Am. Compl. ("Compl.") ¶ 33,

ECF No. 9.)  Plaintiff received a Right to Sue letter from the EEOC on April 26, 2011.  (*Id.*)

Plaintiff filed her first Complaint on July 19, 2011.  (ECF No. 1.)  On September 16, 2011,

Plaintiff filed an Amended Complaint.  (ECF No. 5.)  Plaintiff filed a Second Amended

Complaint on October 5, 2011.  (*See* Compl.)  On October 18, 2011, Defendants filed an Answer

to Plaintiff's Second Amended Complaint.  (Answer, ECF No. 10.)  Defendants jointly filed the

present Motion for Summary Judgment on September 17, 2012.  (Defs.' Mot., ECF No. 20.)  On

November 19, 2012, Plaintiff filed a response to Defendants' Motion.  (Pl.'s Resp., ECF No. 23.)

Defendants filed a reply on November 30, 2012.  (Defs.' Reply, ECF No. 30.)

In this employment discrimination suit, Plaintiff Lana Sampson brings four claims against Defendant Methacton School District ("Methacton") and one claim against Defendants Dr. Timothy Quinn, Robert Harney, and Judith Landis.  Plaintiff alleges that Methacton discriminated against her based on her disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (Count I), unfairly demoted her, denied her a promotion, suspended her, and forced her to resign for exercising her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 (Count II), retaliated against her for filing a complaint with the EEOC, in violation of the ADA (Count III), and created a hostile work environment in retaliation for filing a complaint with the EEOC, in violation of the ADA (Count IV).  In addition, she alleges that Defendants Quinn, Harney, and Landis aided and abetted Methacton's discrimination and retaliation in violation of the ADA, FMLA, and Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 955, *et seq*. (Count V).  (Compl. ¶¶ 50-67.) Plaintiff seeks compensatory damages, which includes expectation, reliance, and restitution damages, front pay, back pay, loss of life's pleasure, loss of reputation, loss of promotional opportunity, benefits, and other damages.  (*Id.*¶¶ 53, 57, 60, 64, 67.)

**B.    Factual History[1]**

At all relevant times, Plaintiff, Lena Sampson, resided in Williamstown, New Jersey. (Sampson Dep. 10, Defs.' Mot. Ex. 1.)  Sampson has a bachelor's degree in health and physical education and a master's degree in education administration.  (*Id.* at 19.)  Defendant Methacton is a School District located in Pennsylvania.  (Compl. ¶ 7.)  Defendant Dr. Timothy Quinn was

---

[1] We view all of the facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiff, the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

the Superintendent of Methacton during the relevant times.  (Defs.' Mot. 1.)  Beginning in June

of 2008, Defendant Robert Haney was the Human Resources Director at Methacton.  (*Id.*)

Beginning in June of 2007, Defendant Judith Landis was the Principal of Methacton High

School.  (*Id.* at. 2.)

### 1.    *Plaintiff's Hiring*

In October of 2006, Plaintiff was interviewed by Dr. Jeff Miller, then Superintendent of

Methacton, Fred Cummings, then Principal at Methacton High School, and Dr. William Kirk,

Human Resources Director at the time.  She was subsequently hired as the Assistant Principal at

Methacton High School.  (Sampson Dep. 23-25.)  During the 2006-2007 school year, Plaintiff

worked with Landis, who was also an Assistant Principal at Methacton.  (Landis Dep. 12, Defs.'

Mot. Ex. 42.)  At the end of the 2006-2007 school year, Landis became the Principal of

Methacton High School.  (Landis Dep. 27.)  On August 27, 2007, Plaintiff had a meeting with

Landis and Cummings at which time the issue of Plaintiff's timeliness in arriving to work was

discussed.  (Sampson Dep. 40-41.)  In conjunction with this meeting, Landis drafted a

memorandum memorializing the meeting and the issues discussed.  (August 2007 Mem., Defs.'

Mot. Ex. 2.)  Landis's letter outlined directives for Plaintiff to follow to verify her arrival time.

(*Id.*)  This was the only such meeting when Plaintiff was initially employed as Assistant Principal

at Methacton High School.  (Pl.'s Resp. 16.)  Until February of 2008, Plaintiff satisfied Landis's

expectations as set forth at the August 27, 2007 meeting.  (Landis Dep. 68.)

### 2.  *Plaintiff's Tenure at Arcola*

In February of 2008, School District Human Resources Director Larry Feeley transferred

Plaintiff to Arcola Intermediate School ("Arcola") to be the Assistant Principal to replace the

former Assistant Principal, Don Bontempo.  (Sampson Dep. 27; Landis Dep. 90-91.)  In April 25, 2008, Dr. Mary Anne DelCollo, then the Principal at Arcola, conducted an Administrator Appraisal for Plaintiff.  (April 2008 Admin. Appraisal, Defs.' Mot. Ex. 3.)  The Appraisal reflected ratings that entirely met or exceeded expectations with an overall rating of "Meets Expectations."  (*Id.*)  Dr. DelCollo's comments reflected that Plaintiff had "successfully transitioned to Arcola," and that DelCollo hoped Plaintiff's attendance would improve.  (*Id.*; Defs.' Mot. 2; Pl.'s Resp. 3.)  In May of 2008, Dr. Quinn became the Superintendent for Methacton.  (Quinn Dep. 11, Defs.' Mot. Ex. 41.)

On January 21, 2009, Superintendent Quinn appointed Plaintiff to the position of Acting Principal of Arcola for twelve weeks, effective February 2, 2009, while Dr. DelCocco was on medical leave.  (Sampson Dep. 74; January 21, 2009 Letter, Defs.' Mot. Ex. 5.)  As Acting Principal of Arcola, Plaintiff received an additional $1,000 per month in compensation. (Sampson Dep. 74-75.)  The position was temporary and Quinn informed Plaintiff that there would be a procedure in place for selecting a permanent principal, if necessary.  (*Id.* at 75; Quinn Dep. 21.)  In light of Dr. DelCocco's need for additional time off from work, Methacton approved an extension of Plaintiff's temporary status as Acting Principal at Arcola for the 2009-2010 school year.  (Sampson Dep. 76; July 22, 2009 Letter, Defs.' Mot. Ex. 6.)  As part of this temporary status extension, Plaintiff received an additional $1,050 per month in compensation. (Sampson Dep. 76.)

### 3.    *Plaintiff's Knee Injury*

Starting in August of 2009, an injury to Plaintiff's knee caused her to walk with a limp. (*Id.* at 63.)  The injury caused pain and swelling.  (*Id.* at 38.)  In September of 2009, Quinn came

4

into Plaintiff's office as part of a weekly visit and saw her limping to her file cabinet.  (*Id.* at Dep. 66-67.)  Quinn asked Plaintiff about her knee and she responded that it was swollen and hurting her.  (*Id.* at 67.)  Plaintiff did not recall Quinn saying anything else about her knee.  (*Id.*)  Quinn did not inquire, and Plaintiff did not volunteer, as to how Plaintiff was injured or about the severity of Plaintiff's injury.  (*Id.*)  In November of 2009, Plaintiff was not able to walk around the building and fulfill her duties at Acting Principal at Arcola.  (*Id.* at 77.)  Between August of 2009 and February of 2010, Plaintiff performed her job duties at Acting Principal at Arcola to the best of her ability.  (*Id.* at 65.)

On November 4, 2009, Quinn wrote a letter to Plaintiff to follow-up a previous meeting. (November 4, 2009 Letter, Defs.' Mot. Ex. 7.)  At the meeting, Quinn told Plaintiff that handouts that she had used at a separate meeting were "garbage."  (Sampson Dep. 107.)  In the letter that Quinn sent to Plaintiff, Quinn referenced a dozen statements made by Plaintiff at that separate meeting that "deeply concern[ed]" him.  (November 4, 2009 Letter.)  Quinn characterized Plaintiff's attitude and offensive responses as "insubordinate and unprofessional."  (*Id.*).

Plaintiff visited her doctor, Dr. Charles Sharkey, on February 9, 2010.  (Sampson Dep. 64.)  Dr. Sharkey diagnosed Plaintiff with a tear of her meniscus.  (*Id.* at 38-40.)  On March 4, 2010, Plaintiff requested to leave work early so that she could attend a medical appointment.  (*Id.* at 100; March 4-5, 2010 E-mails, Defs.' Mot. Ex. 11.)  In response to Plaintiff's request to attend the appointment, Quinn wrote:  "Yes.  Good luck!"  (*Id.*)  Two days later, Plaintiff took a leave of absence pursuant to the School District's employee policy and went on short-term disability in order to have surgery performed on her knee.  (Sampson Dep. 86-87.)  On March 8, 2010, Plaintiff had surgery on her knee.  (*Id.* at 71.)  On March 10, 2010, Plaintiff informed Quinn,

Human Resources Director, Robert Harney, and Jane Martin that her surgery had gone well, that she had a follow-up doctor's appointment on Friday, March 19, 2010, and that she planned to come back to work on Monday, March 21, 2010 "limp-free." (March 10, 2010 E-mails, Defs.' Mot. Ex. 12.) Quinn responded to Plaintiff, writing: "I am glad that everything went well! I hope that you recover quickly and are soon walking around the halls pain free! Take care." (*Id.*) On March 14, 2010, Plaintiff e-mailed Quinn and Harney and indicated that her doctor recommended she stay out of work for one more week and that she wanted to use short-term disability leave to account for the days she would miss. (March 14-15, 2010 E-mails, Defs.' Mot. Ex. 14.) Harney replied that it was no problem and told Plaintiff to "get well soon." (*Id.*) On Friday, March 19, 2010, Quinn e-mailed Plaintiff and asked her to report to his office on Monday morning, March 21, 2010 at 8 a.m. (March 19, 2010 E-mail, Defs.' Mot. Ex. 13.)

That same day, at Plaintiff's follow-up doctor's appointment, her doctor discovered scar tissue on her knee and gave her a prescription to be out of work for another four to six weeks. (Sampson Dep. 104.) Plaintiff did not communicate this update to Quinn until the Monday, March 21st meeting with Quinn. (*Id.* at 104-05.) Plaintiff attended the meeting with Quinn, while on crutches, rather than contact him beforehand to inform him of her doctor's new prescription for additional time off "because [she] was fearful of the behavior that [Quinn] was displaying prior to [her] leave . . . ." (*Id.* at 104.) During the meeting, Quinn was pleasant and professional, but seemed upset that Plaintiff had not previously contacted him about her return. (*Id.* at 113.) Quinn accepted Plaintiff's prescription and said he would forward it to the Human Resources Director and extend Plaintiff's leave with an indication that they would stay in touch. (*Id.* at 112-13.) Prior to taking leave, Plaintiff filled out paperwork provided to her by Harney,

6

but did not complete paperwork with respect to the FMLA.  (*Id.* at 89-90.)  Plaintiff was familiar

with Methacton's policies and procedures, in particular, with the Family and Medical Leave

Policy.  (*Id.* at 90.)  Plaintiff went on leave and received compensation commensurate to her

position at the time.  (*Id.* at 88; Pl.'s Resp. 6.)

    4.  *Interviews For Permanent Principal Position at Arcola*

   While Plaintiff was on medical leave, Arcola began the process of interviewing

candidates for the position of Principal at Arcola.  (Sampson Dep. 91.)  Plaintiff was given an

interview for the position.  (*Id.*)  Her interview lasted approximately thirty-five minutes, during

which she was asked the same questions asked of every interviewee.  (*Id.* at 92-93; Harney Dep.

32.)  During Plaintiff's interview, the interviewers took notes, seemed engaged in the interview,

and never discussed Plaintiff's knee.  (Sampson Dep. 93.)  After the interview, the interviewers

did not discuss Plaintiff's knee.  (Landis Dep. 98.)

   Seventeen candidates interviewed for the position of Principal at Arcola on May 4, 2010

and May 11, 2010.  (Principal Interviews Candidate Scores, Defs.' Mot. Ex. 49.)  Methacton

ranked each candidate who had interviewed for the Principal position at Arcola.  (*Id.*; Landis

Dep. 96-98.)  Based on the composite scores of the first round interviews, Plaintiff had a

cumulative score of 59.64%, which was approximately 34% lower than the top-rated interviewee

and was the worst score by a wide margin.  (Principal Interviews Candidate Scores.)  Only four

interviewees from the first-round were selected for second round interviews, which took place on

May 18, 2010.  (*Id.*)

   On May 17, 2010, while still on medical leave, Plaintiff was examined by Dr. Robert

Ponzio, her orthopedic doctor.  (Sampson Dep. 134; May 17, 2010 Letter, Defs.' Mot. Ex. 16.)

Plaintiff had suffered a setback after spraining her surgically repaired knee during a confrontation with a dog, and Dr. Ponzio recommended that Plaintiff stay out of work for the remainder of the school year.  (*Id.*)  On May 18, 2010, Plaintiff communicated that her leave of absence would be extended for another four weeks.  (May 18-19, 2010 E-mails, Defs.' Mot. Ex. 17.)

On May 21, 2010, Harney mailed a letter to Plaintiff indicating her designation was being changed to Assistant Principal in light of her disability status, which inhibited her ability to perform the duties required of the Acting Principal.  (May 21, 2010 Letter, Defs.' Mot. Ex. 18.)  Plaintiff agreed that she could not perform the duties required of an Acting Principal at the time.  (Sampson Dep. 136-37.)  However, there is no indication that this was a permanent situation.

On May 28, 2010, Quinn prepared a Confidential Memorandum as part of his Weekly Report to the Board of School Directors.  The Memorandum informed the Board members that Lucretia ("Lu") Page had been selected as the new Arcola Principal.  (Confidential Mem., Defs.' Mot. Ex. 19.)  Within that Confidential Memorandum, Quinn described three highly confidential administrative transfers, including John Smink from Assistant Principal at Arcola to the same position at Skyview Upper Elementary School, Ryan Creeden, Assistant Principal at Methacton High School to the same position at Arcola, and Plaintiff, from Assistant Principal at Arcola to the same position at Methacton High School.  (*Id.*)  Quinn made these transfers pursuant to District Policy 309 ("Assignment and Transfer") to avoid having Page work at Arcola with people against whom she competed for the position as Principal.  (Quinn Dep. 93-94; *see also* District Policy 309, Defs.' Mot. Ex. 22.)  As part of her transfer to Methacton High School in the same capacity (Assistant Principal), Plaintiff's compensation was unchanged.  (Harney Dep. 47-48.)

On June 7, 2010, Quinn called Plaintiff to inform her that she was being transferred from Arcola back to Methacton High School as Assistant Principal.  (Sampson Dep. 140-41; June 7, 2010 E-mail, Defs.' Mot. 20.)  That same day, Plaintiff filed a Charge of Discrimination with the EEOC, alleging discrimination by Methacton on the basis of a disability.  (Sampson Dep. 142; EEOC Complaint, Defs.' Mot. Ex. 21.)  Methacton learned that Plaintiff's EEOC charges were pending on June 9, 2010.  (Harney Dep. 42.)  In July of 2010, Methacton learned that Plaintiff was alleging retaliation against Methacton.  (*Id.* at 44-45.)

5.    *Assistant Principal at Methacton High School*

As Assistant Principal at Methacton High School, Plaintiff reported to Judith Landis, Principal at Methacton High School.  (Sampson Dep. 150-52; Job Description, Defs.' Mot. Ex. 23.)  In her role as Assistant Principal, Plaintiff was expected to arrive at school at 7:00 a.m. to, among other things, go to her office, check in her with secretary and confer with her about her day's agenda, organize and check in on substitute teachers, and answer questions from students and staff.  (Sampson Dep. 52-53; Landis Dep. 239-40, 276; September 2010 E-mails, Defs.' Mot. Ex. 24.)  On September 20, 2010, Landis addressed issues related to Plaintiff's attendance and lateness in arriving for work.  Landis spoke with Harney and Quinn about Plaintiff's lateness becoming an issue and they advised her that they could not take action unless Landis could show them documentation on the issue.  (Landis Dep. 112.)  On or around October 20, 2010, Landis began to keep a personal file on Plaintiff's late arrivals.  (Landis Log, Defs.' Mot. Ex. 44.)  Landis claims that she opened this file because secretaries at Methacton High School told her that Plaintiff was entering the building at 7:15 a.m. or 7:25 a.m.  (Landis Dep. 109.)  Landis conveyed concerns about Plaintiff's lateness in person and over e-mail throughout this period.  (*Id.* at 186-

87.)  Landis also reached out to Harney for help in addressing Plaintiff's lateness when Plaintiff's timeliness did not improve.  (*Id.* at 188-89.)

On November 16, 2010, Landis contacted Plaintiff by e-mail noting that she had not arrived on time and reiterated the need for Plaintiff to be at school by 7:00 a.m.  (Sampson Dep. 162-63; Nov. 16, 2010 E-mail, Defs.' Mot. Ex. 25.)  On February 8, 2011, Landis and Harney met with Plaintiff.  (Meeting Notes, Defs.' Mot. Ex. 26.)  At the meeting, Plaintiff did not deny being late on a number of occasions.  (*Id.*)  Plaintiff also indicated that the meeting and scrutiny she was enduring felt like retaliation and that Landis and Harney were creating a hostile work environment for her.  (Sampson Dep. 382-83.)  Plaintiff informed Landis and Harney that the meeting made her stressed and indicated that she would be absent from work the following day because of the stress.  (*Id.* at 383.)  That same day, Plaintiff sent Harney a letter reflecting her view that she was enduring a hostile work environment.  (Feb. 8, 2011 Letter, Defs.' Mot. Ex. 27.)  Two days later, on February 10, 2011, Harney wrote a letter to Plaintiff and requested that she provide him with the names, dates, and events that formed the basis of her belief that she was dealing with retaliation and a hostile work environment.  (Feb. 10, 2011 Letter, Defs.' Mot. Ex. 28.)  Plaintiff did not provide Harney with any information, verbal or written, so that he could investigate her claim of a hostile working environment.  (Sampson Dep. 172-74.)  Plaintiff expected Harney to follow-up on her claim, but she never followed up with him about it.  (*Id.* at 174-75.)

On March 3, 2011, Plaintiff became extremely ill with a stomach virus and could not attend work.  (*Id.* at 180.)  Plaintiff was too ill to call the school, so she directed her husband to do so.  (*Id.*)  Landis did not receive a call from Plaintiff's husband and she e-mailed Plaintiff to

reiterate that Plaintiff should contact Landis directly when she was to be late or absent from work. (Mar. 7, 2011 E-mail, Defs.' Mot. Ex. 29.) Plaintiff had been out of the building for half of the day on March 3, 2011 and no one at Methacton High School knew where she was. (*Id.*) Plaintiff did follow Landis's request to contact her to inform Landis of her absence on Friday, March 4, 2011, and her late arrival on Monday, March 7, 2011. (*Id.*)

On March 9, 2011, Landis and Harney had another meeting with Plaintiff. (March 10, 2011 Letter, Defs.' Mot. Ex. 30.) The next day, Quinn suspended Plaintiff for one day without pay for failing to communicate with anyone from Methacton regarding her absence on March 3, 2011, and for once again arriving late to work on March 7, 2011. (Suspension Letter, Defs.' Mot. Ex. 31.) On March 15, 2011, Quinn sent Plaintiff a letter memorializing a March 14, 2011 meeting, at which Quinn and Harney explained the imposition of the suspension and reiterated their requests for Plaintiff to get approval for absences and to arrive at work in a timely manner. (March 15, 2011 Letter, Defs.' Mot. Ex. 32.) It was not until March of 2011 that Plaintiff was disciplined for her lateness and absences. (Sampson Dep. 184.)

On May 5, 2011, Landis sent a letter to Plaintiff alleging that on May 3 and May 4, 2011, Plaintiff arrived late to work without contacting Landis, which was contrary to the guidance provided to Plaintiff in person on February 8, 2011 and March 7, 2011, and again by letters on February 10, 2011 and March 15, 2011. (*Id.* at 190-91; May 5, 2011 Letter, Defs.' Mot. Ex. 33.) Landis was made aware of Plaintiff's late arrivals as a result of a note from a colleague. (Landis Dep. 260-61.) Landis did not tell Plaintiff who had observed her arriving late on either day, but communicated that information to Harney. (*Id.* at 267-68.) Landis cannot recall whether she followed up on these reports of Plaintiff being late. (*Id.* at 262.) At a meeting on May 5, 2011,

Plaintiff conceded that she was late on one of those two days.  However at a meeting on May 9, 2011, Plaintiff denied that she was late on either day.  (Sampson Dep. 190-91; Landis Dep. 263-64, 269-73; May 11, 2011 Letter, Defs.' Mot. Ex. 34.)  The May 9, 2011 meeting was attended by Plaintiff, Landis, Daniel Petino, a representative of the administrators' group, and Harney.  (May 11, 2011 Letter.)  As a result of Plaintiff's alleged failure to follow protocol on May 3 and May 4, 2011, Methacton suspended her for three days without pay.  (May 13, 2011 Letter, Defs.' Mot. Ex. 35.)

On May 31, 2011, Landis instructed Plaintiff that she was not to enter the school complex through the west wing, check in with Landis, and then drive out of the complex and reenter through the east wing.  (Landis Dep. 279-81; June 15, 2011 E-mails, Defs.' Mot. Ex. 36.)  Landis wanted Plaintiff to be on duty at 7:00 a.m. rather than stopping in and returning to her car to drive around the complex.  (Landis Dep. 280.)  Landis felt that she and Plaintiff "had a very difficult time communicating to one another . . . ."  (Landis Dep. 227-29.)

On June 16, 2011, Plaintiff was suspended for five days without pay.  (Sampson Dep. 194-96; June 16, 2011 Letter, Defs.' Mot. Ex. 37.)  The letter informing Plaintiff of this suspension cited her continuing lateness, her failure to follow instructions regarding entrance into the school complex, and other deficiencies in Plaintiff's performance.  (June 16, 2011 Letter.)  Specifically, Quinn indicated that Plaintiff was late on June 9, June 14, and June 15, 2011.  (*Id.*)  Landis's log indicated that Plaintiff was five minutes late on June 9, 2011 and June 14, 2011, and was seven minutes late on June 15, 2011.  (Landis Log.)  Quinn informed Plaintiff that "[t]his letter represents a last chance for you to correct your behavior."  (June 16, 2011 Letter.)

On June 27, 2011, Landis informed Plaintiff that she was to arrive at the administrative

retreat scheduled for June 29, 2011 at 8:00 a.m.  (Landis Dep. 290-91.)   On June 29, 2011,

Plaintiff went to the high school first, thinking that the administrative employees would meet

there and car pool to the retreat together.  (Sampson Dep. 197-98.)  She then got lost on her way

to the retreat, called Methacton's communications director, Angela Linch, at 7:15 a.m., and

Landis when she was near the retreat.  She finally arrived at the administrative retreat at 8:30

a.m.  (Sampson Dep. 196-98; June 29, 2011 Letter, Defs.' Mot. 38.)[2]  For her late arrival,

Plaintiff was suspended without pay until her evaluation meeting on July 7, 2011.  (June 29,

2011 Letter.)

### 6.    *Termination of Plaintiff's Employment*

At her July 7, 2011 evaluation, Plaintiff was presented with the option of resigning.  (July

7, 2011 Meeting Notes, Defs.' Mot. Ex. 39.)  That same day, Plaintiff received a notice of

charges regarding termination.  (July 7, 2011 Letter, Defs.' Mot. Ex. 40.)  On July 8, 2011,

Quinn sent Plaintiff a letter stating that her behavior at the July 7, 2011 meeting was "entirely

unprofessional, hostile, aggressive, and threatening."  (July 8, 2011 Letter, Pl's Resp. Ex. N.)

The letter reiterated that Plaintiff was suspended without pay pending the hearing on her

dismissal.  (*Id.*)  Plaintiff responded by letter, indicating that she would not resign and that she

believed the actions being taken were retaliatory for her filing an EEOC claim.  (July 8, 2011

Letter, Pl.'s Resp. Ex. O.)

On August 23, 2011, the Methacton School Board voted to dismiss Plaintiff from her

employment with Methacton.  (Sampson Dep. 207-09; August 24, 2011 Letter, Pl.'s Resp. Ex.

---

[2] According to the June 29, 2011 letter, Angela Linch's phone records indicate that
Plaintiff did not actually call Linch until 7:45 a.m.  (June 29, 2011 Letter.)  These phone records
are not a part of the record in this case.

O.)  Over the course of the 2010-2011 school year, Landis logged twenty-three occasions on

which Plaintiff was late for work.  (Landis Log.)  Plaintiff contends she was only late on five

occasions.  (Sampson Dep. 161.)  Plaintiff did not maintain records or documentation with regard

to her arrival time at work.  (*Id.*)

## II.    SUMMARY JUDGMENT STANDARD

Defendants request that the Court enter summary judgment on all of Plaintiff's claims.  A

party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be

counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may

identify an absence of a genuine issue of material fact by showing the court that there is no

evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If

the moving party carries this initial burden, the nonmoving party must set forth specific facts

showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting

that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of

materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is

some metaphysical doubt as to the material facts.").  "Where the record taken as a whole could

not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).  When deciding a motion

for summary judgment, courts must view facts and inferences in the light most favorable to the

nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make

credibility determinations.  *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127

(3d Cir. 1995).

## III.   DISCUSSION

### A.     Violation of the ADA (Count I)

In assessing claims of discrimination on the basis of a disability, courts apply the burden-

shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of

discrimination.  Once a plaintiff has established a *prima facie* case of discrimination, the burden

shifts to the defendant, to "articulate some legitimate, nondiscriminatory reason" for an adverse

employment action.  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (citation omitted).  If

the defendant carries this burden, the burden shifts back to the plaintiff to prove by a

preponderance of the evidence that the legitimate reason proffered by the defendant was a pretext

for discrimination.  *Id*.  The "ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Jones v.

School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *Tex. Dep't of Cmty. Affairs v.

Burdine*, 450 U.S. 248, 252-53 (1981)).

#### 1.     *Prima Facie Case of Discrimination*

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must

demonstrate:  (1) that she is a disabled person within the meaning of the ADA; (2) that she is

otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (3) that she has suffered an adverse employment action that was the result of discrimination.  *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

> i.     Disabled Person Under the ADA

A "disability" is defined as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The ADA provides a list of what constitutes a "major life activity," which includes, but is not limited to:  "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).  According to the EEOC:

> [t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.  Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(1)(iii).  An impairment "substantially limits" an individual if they are unable "to perform a major life activity as compared to most people in the general population. An impairment need not present, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(1)(ii).  "The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis."  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999) (citation omitted).

Methacton contends that Plaintiff's condition was a temporary, non-chronic impairment,

which is not a disability under the ADA.  "[A] temporary, non-chronic impairment of short

duration is not a disability covered by the ADA."  *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375,

380 (3d Cir. 2002) (citing *McDonald v. Pa. Dep't of Public Welfare, Polk Ctr.*, 62 F.3d 92, 96

(3d Cir. 1995)).  Plaintiff responds that the meniscus tear in her left knee was a physical

impairment that substantially limited several life activities, including walking, standing, bending,

and working.  (Pl.'s Resp. 9.)  Plaintiff argues that the appropriate time frame to assess Plaintiff's

disability in determining "whether a person was a 'qualified individual with a disability' for the

purposes of an ADA claim is not made from the time the lawsuit was filed or any other later time

period, but from the point at which the alleged discriminatory decision was made."  *Bowers v.*

*Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535-36 (3d Cir. 2007) (citation omitted).

As discussed above, "not every impairment will constitute a 'disability.'"  29 C.F.R. §

1630.2(j)(1)(ii).  As the Fourth Circuit observed:

> Applying the protections of the ADA to temporary impairments . . . would work a
> significant expansion of the Act.  The ADA simply was not designed to protect the
> public from all adverse effects of ill-health and misfortune.  Rather, the ADA was
> designed to assure [ ] that truly disabled, but genuinely capable, individuals will not
> face discrimination in employment because of stereotypes about the
> insurmountability of their handicaps.  Extending the statutory protections available
> under the ADA to individuals with broken bones, sprained joints, sore muscles,
> infectious diseases, or other ailments that temporarily limit an individual's ability to
> work would trivialize this lofty objective.

*Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir. 1997) *abrogated on other ground*

*by Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir 1999).  An injury like Plaintiff's, involving

several months of limitation without long-term or permanent effect, is not a disability under the

ADA.  *See, e.g.*, *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274-75 (3d Cir. 2012) (finding

that temporary lifting limitations that were removed four months after their inception "are the

very definition of such a non-chronic impairment"); *Bolden v. Magee Women's Hosp. of Univ. of Pittsburgh Med. Ctr.*, 281 F. App'x 88, 90 (3d Cir. 2008) (finding proper district court's determination that no reasonable juror could have concluded the plaintiff had a disability where, after four months of an arm injury, the plaintiff was able to resume many activities and was fully able to resume all activities after seven months); *Ragosa v. Malverne Union Free School Dist.*, 381 F. App'x 85, 88 (2d Cir. 2010) (affirming entry of summary judgment in favor of defendant employer because plaintiff teacher failed to raise a jury question that employer regarded her as disabled as opposed to ineffective).

Methacton cites the case of *Smyth v. Wawa, Inc.*, No. 06-4474, 2008 WL 741036 (E.D. Pa. Mar. 19, 2008), in support of its position.  The Court in *Smyth* granted defendant's motion for summary judgment on ADA discrimination claims based upon the plaintiff's failure to raise a genuine issue of material fact as to whether there was substantial limitation of any of the major life activities (walking, sleeping, or concentrating).  *Id.* at *11-13.  With regard to walking, the court observed that "plaintiff has not produced evidence describing a permanent long-term condition . . . Rather . . . the record reflects a series of temporary knee injuries, for which plaintiff has received treatment."  *Id.* at *12.  The plaintiff in *Smyth* also failed to establish a record of disability or that she was regarded as disable.  Therefore, she failed to make out a *prima facie* claim under the ADA.  *Id.* at *14.

Plaintiff relies on the case of *Tish v. Magee-Women's Hospital of University of Pittsburgh Medical Center*, No. 06-820, 2008 WL 4790733 (W.D. Pa. Oct. 27, 2008).  In *Tish*, the plaintiff tore her anterior cruciate ligament during a skiing accident in February of 2004.  *Id.* at *1.  The plaintiff was unable to return to work until after her maximum leave time had been exceeded and

the defendant terminated her employment on that basis.  *Id.* at *2.  The plaintiff sued under § 504

of the Rehabilitation Act, 29 U.S.C. § 794(a).  *Id.* at *4.[3]  In finding that the plaintiff had a

physical impairment that substantially limited major life activities, the court pointed to a record,

which included numerous doctors' reports indicating continuing issues with her knee for two

years after her injury and initial surgery and an affidavit from the plaintiff, detailing her

limitations both immediately after surgery, and up to two years after the surgery.  *Tish*, 2008 WL

4790733, at *8-9.

    Viewing the evidence in this case in the light most favorable to Plaintiff, we are

compelled to conclude that Plaintiff has failed to demonstrate that the injury to her knee was a

permanent, long term condition that substantially impaired a major life activity.  In August of

2009, Plaintiff injured her knee.  She experienced swelling and discomfort when walking.  By

November of 2009, Plaintiff was having difficulty walking around the building and fulfilling her

duties as Acting Principal at Arcola.  Between August of 2009 and February of 2010, Plaintiff

performed her job duties as Acting Principal at Arcola to the best of her ability.  On March 8,

2010, Plaintiff had surgery performed on her knee.  As a result of the surgery and the

development of scar tissue, Plaintiff missed the remainder of the school year.  Following her time

off and physical therapy, Plaintiff occasionally used a knee brace, and had difficulty standing,

walking, and sitting for long periods of time without feeling discomfort.  In Plaintiff's own

words, "[a]t times I wear a brace still, but I can essentially do everything that I used to do before I

was injured."  (Sampson Dep. 94.)  Moderate difficulties in walking or climbing stairs do not

---

[3] The disability determination standards are the same for the analyses of the Rehabilitation Act and the ADA.  *See Tish*, 2008 WL 4790733, at *5.

bring an individual within the class of persons protected by the ADA.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 108 (3d Cir. 1996); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 183-87 (3d Cir. 1999).  Plaintiff has not provided sufficient evidence to establish a genuine issue of material fact with regard to her alleged limitations.  *See Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 514 (E.D. Pa. 2012) (distinguishing *Tish* and finding that the plaintiff "has not alleged facts regarding his personal condition, which would compel this Court to find that his injury rose to the level of a 'disability,'" where he made only "[a]llegations of 'difficulty' performing acts such as moving and driving").  As in *Smyth*, Plaintiff's injury was finite in duration, not a permanent long term condition.  Plaintiff has failed to establish a physical impairment that substantially limits one or more of the major life activities.

Nor has Plaintiff established a record of impairment.  "Record-of-impairment claims protect individuals who suffer discriminatory action based upon a documented history of a disability, and a plaintiff relying upon a record of impairment must establish a history of a condition that substantially limits a major life activity."  *Adams v. Pennsylvania*, No. 06-2154, 2009 WL 2707601, at *8 (M.D. Pa. Aug. 25, 2009) (internal citations omitted); *see also Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 436-37 (3d Cir. 2009). "[A] relatively short-term absence from work, without any long-term impairment, is generally held to be insufficient to create a record of disability."  *Eshelman*, 554 F.3d at 437; *Cf. id.* at 438 (finding a record of impairment where the jury:  (1) received extensive evidence from the defendant's medical department's files on the plaintiff, which documented symptoms both before and after her time off from work; (2) heard evidence that the defendant was notified that the plaintiff has significant cognitive dysfunction after returning to work; and (3) learned that the plaintiff's supervisors were

aware of her chemotherapy-related memory problems after her treatment).

As discussed above, Plaintiff's injury was limited in duration and impact.  Plaintiff experienced pain and swelling for approximately six months.  She then missed four or five months due to surgery and recuperation.  The collateral effects of Plaintiff's knee injury, including occasional use of a knee brace, difficulty standing, walking, and sitting for long periods of time without feeling discomfort, do not rise to the level of substantial limitations or major life activities.  *See Dawley v. Erie Indem. Co.*, 100 F. App'x 877, 883 (3d Cir. 2004) ("The fact that Dawley took a year leave from work to recover from his operation does not create a record of impairment."); *Adams*, 2009 WL 2707601, at *9 (concluding that prior history of cancer treatment did not create a record of impairment).  Moreover, Plaintiff's medical file contains limited entries for her visits to medical professionals with regard to her knee injury.  (Medical File, Defs.' Mot. Ex. 50.)  The first entry is from February 9, 2010, and reflects notes from Plaintiff's first doctor appointment.  (*Id.*)  The final entry in the file is the May 17, 2010 letter from Dr. Ponzio indicating that Plaintiff should stay out of work for the rest of the school year.  (May 17, 2010 Letter.)  There are no records other than those from this four month period.  The record here is significantly less compelling than the record in *Eshelman*.

Plaintiff has also failed to establish that Methacton regarded her as disabled under the ADA.  To do so, a plaintiff must establish that an employer "misinterpret[ed] information about an employee's limitations to conclude that the employee [was] incapable of performing a wide range of jobs." *Taylor*, 177 F.3d at 190.  It is not enough for an employer to believe that an employee is disabled; rather, an employer must regard the employee to be suffering from an impairment within the meaning of the ADA and make its employment decision on that basis.

21

*Rinehimer*, 292 F.3d at 381 (finding that district court's determination that pneumonia was a temporary condition and not a disability under the ADA was proper, and that plaintiff had failed to prove that defendant had regarded him as having asthma, which is a disability covered by the ADA).

Plaintiff contends that she was initially demoted from her position as Acting Principal at Arcola to Assistant Principal at Arcola while on medical leave because of her disability.  Plaintiff highlights the May 21, 2010 letter drafted by Harney, which reads that because of her "disability status," she would be demoted.  Plaintiff contends that a reasonable trier of fact could conclude that the use of the term "disability status" could refer to Plaintiff's physical condition, rather than how she was being compensated.  (Pl.'s Resp. 14.)  Other than this one reference to Plaintiff's "disability status," Plaintiff does not point to any other evidence to establish that Defendants considered her to be disabled as defined by the ADA.  Rather, the record reflects that Defendants' interaction with Plaintiff regarding her knee were few and far between and were supportive in nature.  Plaintiff acknowledged that during her interview for the role of Principal at Arcola, the subject of her knee never came up.  The undisputed record also reflects that after the interview, the interviewers did not discuss Plaintiff's knee.

Even if Methacton regarded Plaintiff as disabled, which does not appear to be the case, we conclude that Plaintiff has not created a genuine issue of material fact as to whether Methacton made its employment decisions on that basis.  Plaintiff repeatedly alleges that Quinn saw her limping during their weekly meeting in September of 2009, and that other unidentified employees had inquired about her injury until she took leave in March of 2010.  Plaintiff alleges that her demotion from the role of Acting Principal at Arcola to Assistant Principal was the result

of her disability status.  (Pl.'s Resp. 14.)  She in no way, however, connects this action, or any

other, to Methacton's knowledge of her injury outside of unfounded speculation.

Accordingly, Plaintiff has not met her burden to establish that she was disabled under the

ADA.

### ii.   Otherwise Qualified

Methacton does not contest that Plaintiff is otherwise qualified to perform the essential

functions of her job with or without reasonable accommodation.  We  assume Plaintiff has

satisfied this prong of establishing a *prima facie* case of ADA discrimination.

### iii.   Adverse Employment Action Resulting From Discrimination

Even if one were to conclude that Plaintiff had a disability and is otherwise qualified to

perform the essential functions of her job, we conclude that a reasonable juror could not find that

she suffered an adverse employment action resulting from discrimination.  To meet this standard,

Plaintiff "must show that [her] perceived disability was a 'determinative factor'" in Methacton's

decisions to take adverse employment actions.  *Decker v. Alliant Technologies, LLC*, 871 F.

Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Watson v. SEPTA*, 207 F.3d 207, 214-15 (3d Cir.

2000)).  "An adverse employment action is one which alters the employee's compensation,

terms, conditions, or privileges of employment, deprives him or her of employment

opportunities, or adversely affects his or her status as an employee." *Id.*

Plaintiff highlights several adverse employment actions that she believes were evidence

of discrimination:  (1) the November 4, 2009 letter written by Quinn; (2) Plaintiff's demotion

from her role as Acting Principal to Assistant Principal at Arcola while on leave; (3) Plaintiff not

being named Principal at Arcola; (4) Plaintiff being transferred from Arcola to Methacton High

23

School; and (5) harassing e-mails and communications when Plaintiff was on medical leave. (Pl.'s Resp. 14.)

Methacton acknowledges that the decision to not hire Plaintiff as Principal at Arcola and the suspensions and termination of Plaintiff's employment were adverse employment actions. Methacton argues that moving Plaintiff from the role of Acting Principal to Assistant Principal at Arcola when she acknowledged that she could not fulfill the responsibilities of Acting Principal was not an adverse employment action. We agree. Even though as part of the position change, Plaintiff's status as an employee was altered and her compensation was reduced by approximately $1,050 per month, the change was temporary and it was with Plaintiff's agreement. As for Plaintiff being transferred from Arcola to Methacton High School for the 2010-2011 school year, we agree with Methacton that this was not an adverse employment action. "It is well settled that a change in buildings or office conditions is not considered an adverse employment action, nor are a lateral transfer, or changes in title or reporting relationships considered as such." *Walter v. Cumberland Valley Sch. Dist.*, No. 08-1586, 2010 WL 2404367, at *5 (M.D. Pa. June 10, 2010) (citing *Shaner v. Synthes*, 204 F.3d 494, 506 (3d Cir. 2000)).

Plaintiff asserts that the adverse employment actions were the result of her physical impairment. (Pl.'s Resp. 14.) The record does not support this assertion. The only connection Plaintiff alleges is temporal. (*See* Sampson Dep. 82 ("What I believe is that, once again, when Dr. Quinn had knowledge that I had surgery, that I had an injury, that he started treating me differently.").) As discussed above, Plaintiff's allegations are pure speculation. The record contains no evidence that Methacton imposed adverse employment actions on Plaintiff because she had a torn meniscus, let alone that Plaintiff's injury was the "determinative factor" in the

24

decisions to impose such employment actions.  In fact, the evidence is to the contrary.

Correspondence between Quinn and Plaintiff after her injury reflect concern and support for

Plaintiff.  (*See* March 4, 5 2010 E-mails; March 10, 2010 E-mails.)  Harney similarly expressed

support for Plaintiff in her recovery.  (*See* March 14, 15 2010 E-mails.)  Moreover, it is

undisputed that outside of requests for leave initiated by Plaintiff, Defendants did not address

Plaintiff's knee injury apart from one brief interaction between Quinn and Plaintiff in September

of 2009.

 Plaintiff implicitly argues that Methacton treated its employees disparately, which would

evidence pretextual discrimination against her.  The record reflects unsubstantiated allegations

regarding attendance and tardiness related to Assistant Principals Paul Spiewak and Karey

Kochenour, and Spiewak's secretary, Helen Leach.  (Landis Dep. 75-76, 79.)  The record also

reflects that Diana Kernop, the Union President for Methacton teachers, witnessed a number of

individuals regularly arrive late to work.  (Kernop Dep. 6, 22, 23, 27, Pl.'s Resp. Ex. Q.)

Moreover, Kernop did not recall anyone being disciplined for lateness.  (*Id.* at 20.)  However,

Plaintiff acknowledged that she was unaware of how Methacton handled issues with other

employees' timeliness.  (Sampson Dep. 186.)  Methacton disputes Plaintiff's assertions that these

employees were treated differently.  Landis specifically recalls speaking to these individuals

about their infrequent lateness, the situations being remedied, and being contacted when these

individuals were to arrive late.  (Landis Dep. 74-78.)  Plaintiff has not established that Methacton

treated other similarly situated employees differently, and has not established that the District's

legitimate, non-discriminatory reasons for the adverse employment actions were more likely than

not motivated by discrimination.[4]

Accordingly, we are compelled to conclude that Plaintiff has failed to establish a *prima facie* case of discrimination by Methacton on the basis of a disability.  Notwithstanding Plaintiff's failure to establish a *prima facie* case we will assume for the purpose of argument that she did and will consider her claims under the remainder of the *McDonnell Douglas* framework.

2.     *Legitimate Non-Discriminatory Reason for Adverse Employment Action*

An employer may rebut a plaintiff's *prima facie* case of discrimination under the ADA by producing evidence that adverse employment actions were taken for reasons that are legitimate and nondiscriminatory.  *Drwal v. Borough of West View, PA*, 617 F. Supp. 2d 397, 412 (W.D. Pa. 2009) (citing *Burdine*, 450 U.S. at 254).  "An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision."  *Id.* at 412 (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Methacton provides legitimate, nondiscriminatory reasons for each of the adverse employment actions taken in this case.  Methacton contends:  (1) that Plaintiff was changed from Acting Principal to Assistant Principal at Arcola because she could no longer perform the essential functions of the job for the remainder of the school year; (2) that Plaintiff was not offered the position of Principal at Arcola because she was not the most qualified candidate for the job; and (3) that Plaintiff was suspended on several occasions and her employment was

---

[4] Methacton points out that the individuals cited by Plaintiff had different roles and responsibilities and were not truly similarly situated.  (Defs.' Reply, 3.)  In addition, the uncontested record does not reflect that these individuals ignored specific directives from supervisors as was the case with Plaintiff.  (*Id.* at 3-4.)

ultimately terminated because she was persistently late for work and failed to adhere to the directives of her supervisors.  (Defs.' Mot. 19-20.)[5]

Methacton has carried its burden in establishing that it had a legitimate, non-discriminatory reason for each of the adverse employment actions Plaintiff experienced in this case.  *See Stouch v. Tp. of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009) (finding that the defendant's reason for terminating the plaintiff's employment was legitimate where consulting psychologist found that the plaintiff was psychologically unfit for duty and had a personality disorder); *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 573 (M.D. Pa. 2004) (finding that the defendant offered a legitimate, nondiscriminatory reason for adverse employment action where employee was not offered equivalent position upon return from medical leave where company adopted a new payroll automation system that made certain positions redundant).

### 3.   *Pretextual Justification for Adverse Employment Action*

Plaintiff contends that Methacton's proffered legitimate, non-discriminatory reason for its decision to demote Plaintiff from Acting Principal to Assistant Principal at Arcola was a pretext for discrimination.  This is the adverse employment action that Plaintiff claims is applicable to her ADA disability discrimination claim.[6]

> In order to prove the employer's explanation is pretextual, the plaintiff must cast [ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so

---

[5] Methacton's defense of its decision to transfer Plaintiff to Methacton High School is unnecessary because we have determined that it was not an adverse employment action.

[6] Plaintiff frames the remainder of the adverse employment actions as being appropriate to her ADA retaliation claim.  Accordingly, we address them *infra*.

> that a factfinder could reasonably conclude that each reason was a fabrication . . . or . . . allow[ ] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. A plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (internal citations omitted). A plaintiff may also show pretext by demonstrating "that the employer treated other, similarly situated persons not of his protected class more favorably." *Fuentes*, 32 F.3d at 765.

Plaintiff has failed to direct us to any evidence that could reasonably support an inference of pretext. Instead, Plaintiff merely asserts that a reasonable trier of fact could find that Plaintiff was demoted because of her disability. (Pl.'s Resp. 15.) However "[a] plaintiff's personal belief that the real reason for the job action was discriminatory animus does not create a genuine issue of material fact." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, No. 09-6110, 2011 WL 130156, at *8 (E.D. Pa. Jan. 13, 2011) (citing *Waggoner v. Garland*, 987 F. 2d 1160, 1164 (5th Cir. 1993)). Plaintiff's demotion from Acting Principal to Assistant Principal at Arcola, if you can call it a demotion, occurred after she communicated to the staff at Arcola that she would miss the remainder of the school year rehabilitating her knee through physical therapy. (*See* May 18-19, 2010 E-mails.) Three days later, Harney informed Plaintiff that Methacton needed to change her designation "due to the fact that you are unable to perform the duties required of the acting principal for the rest of the year." (May 21, 2010 Letter.) Harney explained that "[w]e fully understand the reasons you can not perform those duties, however, we need to have an administrator in place that can perform the required duties. (*Id.*) The undisputed facts reflect

that Plaintiff was designated as Acting Principal for a limited period of time.  As part of the

process to find a permanent Principal at Arcola, Methacton interviewed seventeen candidates on

May 4, 2010 and May 11, 2010 – two weeks before Plaintiff informed them that she would be

out for the rest of the school year.  (Principal Interviews Candidate Scores.)  This supports rather

than detracts from Defendants' contention that they demoted Plaintiff because they were seeking

someone who could fulfill the responsibilities of the job of Principal at Arcola.

Plaintiff has failed to establish by a preponderance of the evidence that Defendants'

offered non-discriminatory reason for her demotion was pretextual and a justification for

discrimination against Plaintiff.  *See Majewski v. Fischi*, 372 F. App'x 300, 304 (3d Cir. 2010)

(finding that conclusory allegations were insufficient to establish a genuine issue of material

fact); *Flory v. Pinnacle Health Hospitals*, 346 F. App'x 872, 877 (3d Cir. 2009) ("Even viewing

the evidence in the light most favorable to Flory, there is simply no evidence-either direct or

circumstantial-from which a factfinder could either disbelieve Pinnacle's articulated

non-discriminatory reasons or conclude that discrimination on account of her disability was a

motivating or determinative factor in her termination.").

### B.      FMLA (Count II)

Plaintiff alleges that Methacton unfairly demoted her, denied her promotions, suspended

her, and forced her to resign for exercising her rights under the FMLA.  Plaintiff does not assert

an interference claim.  *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir.

2004) (describing an FMLA interference claim, where an employer interferes with an employee's

right to leave under the FMLA, causing injury).[7]  Under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.*, an eligible employee is "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  To establish a claim of discrimination related to FMLA leave, Plaintiff must establish that (1) she took FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse employment decision was causally related to her leave.  *Conoshenti*, 364 F.3d at 146.

Methacton argues that Plaintiff should be foreclosed from seeking relief under the FMLA because she did not take leave pursuant to the Act.  (Defs.' Mot. 29.)  Plaintiff responds that she was not required to expressly invoke the FMLA when taking leave for her surgery.  (Pl.'s Resp. 18.)  "When an eligible employee needs to take FMLA leave that was not foreseeable, '[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA'; rather the employee need only notify the employer that leave is needed."  *Conoshenti*, 364 F.3d at 141 n.6 (quoting 29 C.F.R. § 825.303(b)).  If an employee notifies her employer of an FMLA qualifying medical leave, "the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."  29 C.F.R. § 825.300(b)(1); *see Antone v. Nobel Learning Communities, Inc.*, No. 11-3617, 2012 WL 174960, at *3 (D.N.J. Jan. 19, 2012).  It is the employer who bears the burden of informing the employee of their rights under the FMLA.  *See* 29 C.F.R. § 825.300(c).  Even though Plaintiff took leave

---

[7] Methacton observes that Plaintiff took disability leave pursuant to the Act 93 Agreement, which applies to administrators employed by Methacton.  (Defs.' Mot. 5.) According to Methacton, leave pursuant to this policy was more favorable to Plaintiff than leave pursuant to the FMLA, as Plaintiff was compensated during her absence.  (*Id.* at 30.)

pursuant to Methacton's short-term disability leave policy, (*see* March 14-15, 2010 E-mails), we will assume, for the sake of argument, that she invoked leave pursuant to the FMLA.[8]  With regard to the second factor, as discussed above, Plaintiff suffered adverse employment actions.

"To prove FMLA retaliation, an employee must show that his [or her] employer intentionally discriminated against him [or her] for exercising an FMLA right."  *Martin v. Brevard Cnty Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008).  In FMLA retaliation cases, the Third Circuit has articulated two factors to consider in establishing a *prima facie* case of retaliation: (1) timing; or (2) evidence of ongoing antagonism.  *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

Since FMLA retaliation claims are subject to the same burden-shifting analysis as ADA claims, *Masicoli v. Arby's Restaurant Grp., Inc.*, 610 F. Supp. 2d 419, 430, 432 (W.D. Pa. 2009), we need not restate our analysis.  As discussed above, Plaintiff has failed to establish a *prima facie* case of discrimination.  Although Plaintiff does assert that there was temporal proximity between her exercising of her rights to leave time and the adverse employment action, that she received hostile e-mail communications while on leave, and that once she returned to work, she was subject to ongoing antagonism by way of harassment over her arrival time, (Sampson Dep. 82, 169, 178), these assertions are not based on facts in the record.  Moreover, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).  Plaintiff cannot demonstrate a causal connection between her demotion and her protected activity of

---

[8] We note, however, that in *Tish*, the main case on which Plaintiff relies, the plaintiff had formally applied for FMLA leave.  *Tish*, 2008 WL 4790733, at *1.

31

requesting and taking leave.  Even if Plaintiff has established a *prima facie* case of FMLA

retaliation, Methacton has proffered a legitimate non-discriminatory reason for the adverse

employment action and Plaintiff has done nothing more than assert that Methacton's reasons

were pretext.

Accordingly, there is no genuine issue of material fact with regard to Plaintiff's FMLA

retaliation claim.

### C.       Retaliation (Count III)

Plaintiff maintains that Methacton retaliated against her for filing a complaint with the

EEOC.  "To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show:  (1)

protected employee activity; (2) adverse action by the employer either after or contemporaneous

with the employee's protected activity; and (3) a causal connection between the employee's

protected activity and the employer's adverse action."  *Krouse*, 126 F.3d at 500.  A plaintiff need

not establish that she is disabled to prevail on an ADA retaliation claim.  *Williams*, 380 F.3d at

759 n.2.  As with ADA discrimination and FMLA retaliation claims, ADA retaliation claims are

analyzed under the *McDonnell Douglas* burden-shifting framework.  *Larkin v. Methacton Sch.*

*Dist.*, 773 F. Supp. 2d 508,529 (E.D. Pa. 2001).

Plaintiff does not argue and has failed to establish that there is a genuine issue of material

fact with regard to whether Methacton retaliated against her for filing her EEOC complaint.  As

with Plaintiff's other claims, she has failed to make a *prima facie* case and Methacton has

provided legitimate, non-discriminatory reasons for the adverse employment actions Plaintiff

suffered.

With regard to Plaintiff not being hired for the role of Principal at Arcola, the record

reflects that Plaintiff was given an interview for the position.  Her interview lasted approximately

thirty-five minutes, during which time she was asked the same questions asked of every

interviewee.  She was not asked about her knee or her EEOC complaint.  There is no evidence

that Plaintiff's EEOC complaint was a factor in the interview process.  The evidence does reflect

that seventeen candidates were interviewed for the position of Principal at Arcola on May 4,

2010 and May 11, 2010, that they were ranked, and that Plaintiff had a cumulative score of

59.64%, which was approximately 34% lower than the top-rated interviewee and the worst score

by a wide margin.  Only four interviewees from the first-round were selected for second round

interviews.  Methacton's reason for not appointing Plaintiff to the position of Principal at Arcola

was legitimate and non-discriminatory.  Plaintiff asserts otherwise, but cannot point to anything

in the record to support that assertion.

Methacton's decision to suspend Plaintiff and later terminate her employment is also

legitimized by the record.  The record reflects evidence of numerous warnings to Plaintiff

regarding her perpetual inability to arrive to work on time.  Officials at Methacton first reminded

Plaintiff that she needed to arrive on time at 7:00 a.m. on September 20, 2010.  They then

provided guidance to Plaintiff in person regarding her lateness on February 8, 2011 and March 7,

2011 and again by letters on February 10, 2011, March 15, 2011, May 5, 2011, May 13, 2011,

and June 16, 2011.  Over the course of the 2010-2011 school year, Landis logged twenty-three

occasions on which Plaintiff was late for work.  Plaintiff contends she was only late on five

occasions, but maintained no records or documentation with regard to her arrival time at work.

Moreover, Plaintiff's first suspension by Methacton occurred ten months after Plaintiff filed her

complaint with the EEOC.  (Defs.' Reply, 2.)  Even considering the facts in the light most

favorable to Plaintiff, we conclude that Methacton's reasons for suspending Plaintiff and terminating her employment were legitimate and non-discriminatory.  Plaintiff's assertion that these adverse employment actions were the result of her filing a complaint with the EEOC finds no support in the record.

Plaintiff has failed to prove by a preponderance of the evidence that Methacton's proffered justifications were pretextual.  Accordingly, there is no genuine issue of material fact with regard to Plaintiff's ADA retaliation claim.

**D.      Hostile Work Environment (Count IV)**

Plaintiff also contends that Methacton created a hostile work environment in retaliation for filing a complaint with the EEOC, in violation of the ADA.  To establish a hostile work environment under the ADA, a plaintiff must show that

> (1) [she] is a qualified individual with a disability under the ADA; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on his disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive working environment; and (5) [her employer] knew or should have known of the harassment and failed to take prompt effective remedial action.

*Hamera v. Cnty. of Berks*, 248 F. App'x 422, 425 (3d Cir. 2007) (quoting *Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999)).  As discussed above, Plaintiff has failed to establish that she had a disability under the ADA and that any mistreatment or retaliation was caused by her physical impairment.  Even if those elements were present, Plaintiff would need to prove that she endured an objectively hostile environment that she also perceived as hostile or abusive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  "[T]he Americans with Disabilities Act does not make all harassment, or every unpleasant

working environment, actionable under the law.  Rather, to constitute a hostile work environment under the ADA, the harassing conduct must be because of the plaintiff's disability." *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 448-49 (E.D. Pa. 2006) (finding that the plaintiff failed to raise an issue of material fact that his disability rather than several other potential reasons was the basis for his employer's conduct).  In evaluating a hostile work environment claim under the ADA, a court must consider the record as a whole. *Cardenas v. Massey*, 269 F. 3d 251, 260-61 (3d Cir. 2001).

Plaintiff argues that less than a month after she returned to work, "Landis colluded with Harney and Quinn to write down every time she heard from someone that Plaintiff arrived late to work."  (Pl.'s Resp. 16.)  Plaintiff cites her reprimands, suspensions, and the eventual termination of her employment as evidence of the hostile work environment that she endured. (*Id.*)  Plaintiff has not raised a genuine issue of material fact regarding a hostile work environment based on her physical impairment.  At most, the record reflects that Methacton school officials vigorously policed Plaintiff's arrival time in the 2010-2011 school year.  If a hostile environment was created, it was created by Plaintiff herself.  There is no indication that this enforcement was related to Plaintiff's knee injury from the prior school year.

In addition, two days after Plaintiff sent Harney a letter reflecting her view that she was enduring a hostile work environment, Harney wrote a letter to Plaintiff and requested that she provide him with the names, dates, and events that formed the basis of her belief that she was dealing with retaliation and a hostile work environment.   Plaintiff did not provide Harney with written information so that he could investigate her claim of a hostile working environment. Despite Plaintiff's expectations that Harney would follow-up on her claim, the record reflects

that upon Harney requesting information, it was Plaintiff who failed to respond.

Accordingly, Plaintiff has failed to raise a genuine issue of material fact regarding her claim that Methacton created a hostile work environment in violation of the ADA.

### E.       Aiding and Abetting (Count V)

Plaintiff also asserts that Defendants Timothy Quinn, Robert Harney, and Judith Landis aided and abetted Methacton's discrimination and retaliation in violation of the ADA, FMLA, and the PHRA.  As discussed above, there were no primary violations of the ADA or FMLA.  Moreover, neither statute provides for aiding and abetting liability for individual employees.  *See Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 705 (E.D. Pa. 2010); *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998).

Under the PHRA, it is unlawful for any person to compel, coerce, incite, aid, or abet a violation of the Act.  43 Pa. Cons. Stat. Ann. § 955(e).  Section 955(e) permits a plaintiff to recover from individual employees who aid and abet violations of the PHRA.  *Id.*; *Dici v. Com. of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996).  Individual defendants cannot, however, be liable for violations of Section 955(e) if there is no primary violation of the PHRA.  *See Burgess-Walls v. Brown*, No. 11-275, 2011 WL 3702458, at *6 (E.D. Pa. Aug. 22, 2011); *Kaniuka v. Good Shepherd Home*, No. 05-02917, 2006 WL 2380387, at *10 (E.D. Pa. Aug. 15, 2006).

Accordingly, Plaintiff's claim against the individual Defendants must be dismissed.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants Methacton School District, Timothy Quinn, Robert

Harney, and Judith Landis's Motion for Summary Judgment Motion will be granted.

An appropriate Order follows.

                                        **BY THE COURT:**


                                        **/s/ R. Barclay Surrick**

                                        _____

                                        **R. BARCLAY SURRICK, J.**